UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

RANDY MELTON,

            Plaintiff,

v.                                      Civil Action No. 2:12-cv-1697

PRECISION LASER & INSTRUMENT, INC.,

            Defendant.


MEMORANDUM OPINION AND ORDER

        Pending is the motion to dismiss for failure to state
a claim by defendant Precision Laser & Instruments
("Precision"), filed June 1, 2012.


I. Background

        Plaintiff Randy Melton ("Melton") commenced this
action in the Circuit Court of Kanawha County, West Virginia on
April 24, 2012.  He is a resident of Kanawha County, West
Virginia.  Compl. ¶ 1.  Precision is a Pennsylvania corporation
with a principal place of business in Ambridge, Pennsylvania.
Id. ¶ 2.

        Precision hired Melton as "Survey/Mapping Sales and
Support Manager" of its Charleston, West Virginia office in June
2009.  Id. ¶ 5.  On June 16, 2009, the parties signed an

Employment Agreement which provided that Melton would receive a yearly salary of $55,000.  Id. ¶¶ 6-7.  Additionally, the Employment Agreement provided for commissions, including a 5% commission on "all sales from existing 'Special Project Contract' Sales that have existing contracts with GPS Innovations."  Employment Agreement 1.

Melton's relationship to GPS Innovations ("GPSI") and the meaning of "Special Project Contract Sales" are unclear from the record.  The complaint describes GPSI as "Melton's former company."  Compl. ¶ 6.  On June 29, 2009, Melton, acting on behalf of GPSI as its president, signed an Asset Purchase Agreement with Precision, pursuant to which Precision appears to have acquired assets of GPSI.  Asset Purchase Agreement 7. These factors and the nature of the contracts, claims, and parties' briefing suggest to the court that Melton owned GPSI, although the record does not expressly state that to be the case.  The term "Special Project Contract Sales" is not defined, but the Employment Agreement indicates that any such contract would be "transferred over to [Precision] ownership" from GPSI. Employment Agreement 1.  The court surmises that the term refers to any Precision contract that originated with GPSI, although it is possible that the true meaning is limited to some subset thereof.  The Employment Contract does specify that the Special

Project Contracts "include . . . West Virginia Highway Contract, NASA GIST, Navy Research Lab, Weeks Marine and Marine MC (NZ)." Id.

The Asset Purchase Agreement transferred to Precision "all of Seller's right, title, and interest in and to all the assets, property rights (tangible and intangible), used in the operation of GPS Innovations." Asset Purchase Agreement 1.  In consideration, Precision paid to GPSI $215,000, with $100,000 of the purchase price allocated toward "Fixed Assets and Inventory" and the remaining $115,000 allocated to "Intangible Assets." Id. at 3.  It is those Intangible Assets which presumably give rise to the Special Project Contracts.  Accordingly, in his complaint, Melton claims that he transferred the "'Special Project Contract' sales" to Precision ownership "[a]s a result of" his promised 5% commission on all sales therefrom.  Compl. ¶ 23.

On June 30, 2009, Melton and Precision entered into a Confidentiality and Non-Competition Agreement ("CNC Agreement"). The CNC Agreement stated that Melton's employment could be terminated "at any time, with or without cause," and it "d[id] not create any obligations on the part of [Precision] to employ Melton for a fixed period of time."  Id. ¶¶ 8-9, 33.  The agreement, nonetheless, indicated Precision's "intention" to

3

retain Melton for at least five years. Id. ¶ 9. Also on June 30, 2012, Melton and Precision entered into an Addendum to the Employment Agreement ("Addendum"). Id. ¶ 10. The Addendum reiterated Precision's intent to retain Melton for five years and provided for a severance payment of one year's salary if Precision terminated Melton's employment within the first nine months. Id. ¶¶ 11-12. Precision terminated Melton's employment on May 14, 2010, nearly eleven months after his hiring. Id. ¶ 16.

The complaint contends that Precision's intentions, as represented in the CNC Agreement and the Addendum, altered Melton's at-will status to that of an employee with an employment term of no less than five years. Id. ¶ 38. Melton entered into the agreements "under the assumption" that his employment would last for that term. Id. ¶ 13. The complaint further states that Precision "did not intend" to employ Melton for five years, but rather made such representations to "induce Melton to enter into the [Asset Purchase] Agreement." Id. ¶ 15. Melton asserts that he relied on Precision's false representations and that his reliance "was justified" due to "the large amount of GPSI's assets" sold under the Asset Purchase Agreement. Id. ¶ 45. The Asset Purchase Agreement is itself a source of contention, as Melton alleges that Precision

4

has refused to pay him for certain assets or to remove the items from his storage facility.  Id. ¶ 18.

Melton also claims that Precision has refused to pay him the 5% commission on sales from the Special Project Contracts.  Id. ¶ 19.  No commission payments have been made since May 14, 2010.  Id. ¶ 29.  The complaint asserts that payments should have been made for "all sales to any customer or client referenced as a former GPSI customer or client, not just for those sales made by Melton."  Id. ¶ 26.  It states that Precision "ignored many of the types of sales" which would have resulted in commissions and consequently "failed to pay Melton everything due to him under the Employment Agreement."  Id. ¶¶ 24-25.

Melton adds that Precision "interfered with Melton's right to receive the 5% commission" by selling the "West Virginia-based [Precision] Machine Control Business."  Id. ¶ 27. The record does not make clear what the Machine Control Business is or how it relates to "Melton's right" to receive commissions. Presumably, Melton means that the Machine Control Business generated Special Projects Contract sales and that Precision improperly interfered with his contractual rights by selling it. Along these lines, in an allegation that is rather inscrutable, he asserts that he is owed a commission for the "anticipated

sales from the lost business to the [Precision] Machine Control Business."  Id. ¶ 28.

Melton's five-count complaint sets forth the following claims: Count One, "Breach of Employment Contract"; Count Two, "Breach of Confidentiality and Non-Competition Agreement and Breach of Addendum to Employment Agreement"; Count Three, "Fraudulent Inducement"; Count Four, "Violation of the Wage Payment and Collection Act"; and Count Five, "Negligence."

On May 25, 2012, Precision removed, invoking the court's diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a)(1).  On June 1, 2012, Precision filed a motion to dismiss Counts One, Two, Three, and Five and to dismiss Count Four in part, all for failing to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II. The Governing Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

6

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 545 (2007) (alternation in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570); see also Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009). Facial plausibility exists when the court is able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 566 U.S. at 678 (quoting Twombly, 550 U.S. at 556). The plausibility standard "is not akin to a 'probability requirement,'" but it requires more than a "sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556).

In assessing plausibility, the court must accept as true the factual allegations contained in the complaint, but not the legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The determination is

"context-specific" and requires "the reviewing court to draw on
its judicial experience and common sense."  <u>Id.</u> at 679.


### III. Discussion

A. Choice of Law

        Precision and Melton dispute what law should govern
their contracts and related claims.  Precision asserts that the
CNC Agreement and Asset Purchase Agreement must be construed in
accordance with Pennsylvania law due to choice-of-law provisions
within the agreements.  Def.'s Mem. Supp. Mot. Dismiss 6.
Precision asserts that the fraud and negligence counts, which
arise from those contracts, should likewise fall under
Pennsylvania law.  Melton responds that "[w]hile some of the
contractual claims may be governed by Pennsylvania law, any tort
claims are not."  Pl.'s Resp. Opp'n. to Def.'s Mot. Dismiss 3.
The parties appear to agree that West Virginia law controls
construction of the Employment Agreement and its Addendum and
that the West Virginia Wage Payment and Collection Act is
applicable.  The court must determine what law governs the CNC
Agreement, the Asset Purchase Agreement, and the tort claims.

        When exercising diversity jurisdiction, a federal
district court must apply the choice-of-law rules of the state

in which it sits.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313
U.S. 487, 496 (1941); Volvo Const. Equip. N. Am., Inc. v. CLM
Equip. Co., 386 F.3d 581, 599-600 (4th Cir. 2004).  In this
case, West Virginia's rules apply.

For contract cases, the West Virginia rule provides
that "[t]he law of the state in which a contract is made and to
be performed governs the construction of a contract when it is
involved in litigation in the courts of this state."  Howe v.
Howe, 218 W.Va. 638, 643, 625 S.E.2d 716, 721 (2005).  However,
"the parties themselves may defeat the traditional conflict of
laws principle . . . by making a choice of law in the contract."
Nadler v. Liberty Mut. Fire Ins. Co., 188 W.Va. 329, 334 n.8,
424 S.E.2d 256, 261 n.8 (1992).  Such a provision will be
enforced "unless the chosen state has no substantial
relationship to the parties" or the chosen state's law "would be
contrary to the fundamental public policy of the state whose law
would" otherwise apply.  Bryan v. Mass. Mut. Life. Ins. Co., 178
W.Va. 773, 777, 364 S.E.2d 786, 790 (1987).  Public policy
concerns will not invalidate a choice-of-law provision based on
"[t]he mere fact that the substantive law of another
jurisdiction . . . is less favorable than the law of the forum
state."  Nadler, 188 W.Va. at 336, 424 S.E.2d at 263.  The West
Virginia Supreme Court has stated that it "does not take a

request to invoke our public policy to avoid application of otherwise valid foreign law lightly." <u>Howe</u>, 218 W.Va. at 646, 625 S.E.2d at 724.

There are two choice-of-law provisions in this case. The CNC Agreement states, "(g) This agreement shall be construed in accordance with the Laws of the Commonwealth of Pennsylvania; and the Laws of the Commonwealth of Pennsylvania shall govern the rights and obligations of the parties hereunder." Def.'s Mot. Dismiss Ex. C, at 3. The Asset Purchase Agreement similarly states, "(b) <u>Governing Law</u>. This Agreement shall be construed and enforced in accordance with and shall be governed by the laws of the Commonwealth of Pennsylvania." Def.'s Mot. Dismiss Ex. A, at 5. Upon review, the court finds the choice-of-law provisions to be valid. Pennsylvania has a substantial relationship to the parties. Precision is headquartered in Pennsylvania, and the facts on the record indicate that it was Precision representatives from Pennsylvania who contracted with Melton. Application of Pennsylvania law does not thwart any fundamental public policies of West Virginia.

Melton's claim that Precision asks the court to accept the choice-of-law assertion "without the benefit of the contracts" is plainly erroneous as Precision placed the contracts on the record as exhibits to its motion to dismiss.

10

Additionally, despite Melton's suggestion to the contrary, the court is able to make a choice-of-law determination without a separate "motion supporting the claim."  The court, therefore, finds that the choice-of-law provisions are valid and that Pennsylvania law controls construction of the CNC Agreement and Asset Purchase Agreement.

Melton's remaining two counts - fraud in the inducement and negligence - are not controlled by the choice-of-law provisions because they sound in tort rather than in contract.  See Cavcon, Inc. v. Endress + Hauser, Inc., 557 F. Supp. 2d 706, 720 (S.D. W. Va. 2008) (finding that the plaintiff's negligence and fraud counts were "tort or quasi-tort claims, which d[id] not require an interpretation of the agreement," and applying West Virginia law to those counts despite a valid out-of-state choice-of-law provision in the underlying contract).  Tort claims are governed by "the traditional, general choice-of-law principle used in West Virginia of lex loci delicti."  Id.  Under this theory, "the substantive rights between the parties are determined by the law of the place of injury."  West Virginia ex rel. Chemtall Inc. v. Madden, 216 W.Va. 443, 451, 607 S.E.2d 772, 780 (2004).  Melton was employed in West Virginia, and the record suggests that the injury occurred there.  The record does not suggest that the

injury in any way occurred in Pennsylvania or elsewhere. Accordingly, West Virginia law applies to Melton's fraud and negligence claims.

**B. "Special Project Contract" Sales Commissions**

Count One asserts that Precision breached the Employment Contract by withholding 5% commissions due to Melton from "Special Project Contract" Sales.  The relevant paragraphs of the Employment Contract provide as follows:

> Salary: $1,057.70/week ($55,000.00/year) plus 3% commission on sales (Net 1 or Gross minus tax) to benchmark sales goal and 5% thereafter.  3% commissions will be paid on all warranties sold. 10% commission will be paid on rentals (Net 1 or Gross minus tax).  10% commission will be paid on all training revenue generated by you.
>
> 5% commission will be paid on all sales from existing "Special Project Contract" Sales that have existing contracts with GPS Innovations.  In turn, those contracts will be transferred to [Precision] ownership.  Those contracts include, West Virginia Highway Contract, NASA GIST, Navy Research Lab, Weeks Marine and Marine MC(NZ).

Def.'s Mem. Supp. Mot. Dismiss 4.  Melton's complaint asserts that he is owed money because Precision "ignored many types of sales covered" by the commission agreement.  Not. Removal ¶ 25. He also asserts that the 5% commission applies to all "Special Project Contracts" sales and not merely to sales conducted by him personally.  Id. ¶ 26.  Finally, Melton specifies that he is

12

owed commissions on Precision's sale of the Precision Machine
Control Business and on all sales that would have occurred but
for the sale of that business.  Id. ¶¶ 27-28.

        Precision seeks to dismiss Claim One to the extent
that it seeks commissions for sales arising subsequent to the
termination of Plaintiff's employment.  Def.'s Mot. Dismiss ¶ 4.
Precision argues that the Employment Agreement does not provide
for such commissions and does not place limitations on
Precision's right to dispose of or discontinue any parts of its
business.  Id. ¶ 6.  Precision contends that Melton's
interpretation is not "factually plausible" and "would turn an
otherwise ordinary offer of employment into a contract requiring
the perpetual payment of commission to Plaintiff without
relation to the terms and conditions of employment."  Def.'s
Mem. Supp. Mot. Dismiss 3-4.  Precision further contends that
Melton's contractual construction contradicts the "underlying
premise of commission-based sales" and would "overturn the
standard practice in an industry for decades."  Id. at 5.

        Melton counters only with the assertion that Precision
did not support its argument by attaching the contract - a claim
that, as discussed above, is plainly inaccurate.  Pl.'s Resp.
Opp'n. to Def.'s Mot. Dismiss 2-3.  Precision points out that
Melton's Response does not reference post-employment commissions

or obligations, despite the focus of Precision's motion on that very point.  Def.'s Reply Supp. Mot. Dismiss 4.  As such, Precision again contends that the contract unambiguously limits commissions to the employment term and should be interpreted by its plain language.  Id.

Precision correctly states the principle that "contracts containing unambiguous language must be construed according to their plain and natural meaning."  Fraternal Order of Police, Lodge No. 69 v. City of Fairmont, 196 W.Va. 97, 101, 468 S.E.2d 712, 716 (1996).  Ambiguities exist, however, where an "agreement's terms are inconsistent on their face or where phraseology can support reasonable differences of opinion as to the meaning of words employed and obligations undertaken."  Id. The resolution of such ambiguities typically hinges on the parties' intent, which is "often, but not always" revealed by "marshaling facts extrinsic to the language of the contract document."  Id. at 101 n.7, 468 S.E.2d at 716 n.7.

The court finds that the Employment Contract in this case is ambiguous.  Melton's interpretation does stretch the "underlying premise of commission-based sales," as Precision asserts.  Yet, the language that the commissions be paid "[i]n turn" so that the Special Project Contracts "will be transferred over to [Precision] ownership" suggests elements of a purchase

agreement, rather than that of a run-of-the-mill commission-based sale.  One could reasonably conclude that Precision would not be able to terminate its obligation at will under such a contract.

The court acknowledges that the indefiniteness of the term under which Precision would have to pay a commission strains this interpretation, but Precision's interpretation has similar shortcomings.  First, the provision lacks language limiting the commission to Melton's term of employment.  Second, the provision does not specify that Melton himself must make the sales or, if so, how the commission would relate to the standard sales commissions listed in the previous paragraph.  Finally, Precision's interpretation does not explain the provision regarding the transfer of contracts, a provision that appears to be well outside the purview of an ordinary employment contract. These apparent inconsistencies prevent the court from concluding, as Precision insists, that the contract plainly limits commissions to the employment term.

It is possible that, as Precision argues, "standard practice[s] in the industry" render the language unambiguous in light of the parties' expertise.  The record, nonetheless, indicates no such standard practices, and the contract, on its face and as interpreted by its plain meaning, is ambiguous.  As

the court cannot conclude as a matter of law that Melton's interpretation is unreasonable, Precision's motion to dismiss with respect to Count One must be denied.

C. Melton's Employment Term

        Count Two alleges that Precision breached the CNC Agreement and Employment Agreement Addendum by terminating Melton's employment after less than five years.  The relevant language of the agreements is reproduced here.  The Addendum states that

>    It is understood that [Precision] wishes to retain Randy Melton for a period of no less than 5 years. Randy will work under a non-compete while employed by [Precision] and the non-compete will be valid for 3 years, in the event Randy should depart from [Precision].  . . .

>    In the event, [Precision], should choose to release Randy within the first 9 months of employment, unless released for any illegal partaking by Randy Melton, [Precision] agrees to pay Randy, 1-year severance pay.

Def.'s Mot. Dismiss Ex. B, at 4.  The CNC Agreement discusses the employment term in two places.  It begins by declaring, "WHEREAS, Precision Laser employs the Employee on an at-will basis" and elaborates as follows:

>    The Employee acknowledges that this Agreement does not create any obligation on the Employee's part to work for Precision Laser nor for Precision Laser to employ the Employee for any fixed period of time, and

> that Employee's employment may be terminated at any
> time with or without cause. [Precision's] intention
>
> within this acquisition will be to retain Randy
> Melton for a period of no less than 5 years.

Def.'s Mot. Dismiss Ex. C, at 4.  Precision argues that the
agreements make clear that Melton was an at-will employee.
Melton responds that the "intention" language within the two
contracts is sufficient to transform his at-will employment into
a term contract.  Pl.'s Resp. Opp'n. to Def.'s Mot. Dismiss 3.

As discussed above, the agreements at issue here are
subject to two different states' laws: West Virginia law for the
Employment Agreement and Addendum and Pennsylvania law for the
CNC Agreement.  The two states, however, take substantially the
same approach to at-will employment.  Both states, absent
statutory or contractual provisions to the contrary, are at-will
jurisdictions in which employment can be terminated for any
reason by either party to the contract.  Nix v. Temple Univ. of
the Commw. Sys. of Higher Educ., 408 Pa. Super. 369, 374, 596
A.2d 1132, 1135 (Pa. Super. Ct. 1991) ("[I]n Pennsylvania an at-
will employment environment is the norm, absent a contract to
the contrary, and thus, an employee can be terminated for good
reason, bad reason, or no reason at all."); Cook v. Heck's Inc.,
176 W.Va. 368, 372, 342 S.E.2d 453, 457 (1986) ("In the realm of

the employer-employee relationship, West Virginia is an 'at will' jurisdiction.").

Both states place the burden on the employee to overcome the presumption of at-will employment.  In Pennsylvania, "[t]he burden is on the plaintiff in such cases to overcome the presumption by showing facts and circumstances establishing some tenure of employment." Cummings v. Kelling Nut Co., 368 Pa. 448, 452, 84 A.2d 323, 325 (1951).  In West Virginia, terms which allegedly alter at-will employment "must be very definite to be enforceable." Suter v. Harsco Corp., 184 W.Va. 734, 737, 403 S.E.2d 751, 754 (1991) (emphasis in original).  In addition, "where an employee seeks to establish a permanent employment contract or other substantial employment right, either through express promises by the employer or by implication . . ., such claim must be established by clear and convincing evidence." Adkins v. Inco Alloys Int'l., Inc., 187 W.Va. 219, 225, 417 S.E.2d 910, 916 (1992).

Under either formulation, Melton has not met his burden.  The provisions on which he relies only express that Precision "wishes" or has the "intention" to employ Melton for five years.  Taken within the context of the contracts as a whole, these indefinite terms are far from establishing that Precision will employ Melton for five years.  Language that

Melton will receive a one-year severance if Precision should "choose to release Randy within the first 9 months" is inconsistent with a five-year term.  And language that the agreement "does not create any obligation . . . to employ the Employee for any fixed period of time" is directly contradictory to a five-year term.

Melton's reliance on Cook is unpersuasive, as the analogy between the current case and those involving personnel manuals does not hold.  In personnel manual cases, the manuals constitute a unilateral promise, which the employees accept through continued employment.  See Cook, 176 W.Va. at 373-74, 342 S.E.2d at 459.  Precision's stated intentions in this case cannot constitute a promise to employ Melton for five years when considered with the other limiting language.  The facts before the court do not plausibly support the contention that the agreements created a five-year employment term.  Thus, Precision's motion to dismiss with regard to Count Two must be granted.

D. The Wage Payment and Collection Act

Count Four asserts that Precision is in violation of the Wage Payment and Collection Act ("the Act"), West Virginia Code § 21-5-4(b), for not paying to Melton, within seventy-two

hours, money owed under the Employment Agreement with respect to Special Project Contract Sales commissions.  Precision moves to dismiss the claim to the extent that it includes commissions for "sales occurring subsequent to Plaintiff's separation from employment."  Def.'s Mot. Dismiss ¶ 16.  Precision asserts that such commissions are not "wages" as contemplated by the Act. Def.'s Mem. Supp. Mot. Dismiss 14.  In his Response, Melton states that he "has not made a claim for post-termination violations of the [Act]."  Pl.'s Resp. Opp'n. to Def.'s Mot. Dismiss 6.

In the Act, "wages" are defined as "compensation for labor or services" and "then accrued fringe benefits."  W. Va. Code § 25-5-1(c).  While post-termination commissions do not appear to be wages, Melton's stipulation that he is not claiming violation for such commissions obviates the need for the court to address the issue.  The court grants Precision's motion with regard to Count Four, dismissing any claims Melton has or may have had under the Wage Payment and Collection Act with respect to post-termination commissions.

E.  Fraudulent Inducement

Count Three alleges that Melton was fraudulently "induced into entering into the [Asset Purchase Agreement]" by

the Addendum's and CNC Agreement's "stated employment period of no less than five years." Compl. ¶¶ 41-43.  Melton asserts that his reliance on Precision's intentions "was justified" "[g]iven the large amount of GPSI's assets sold to [Precision]." <u>Id.</u> ¶ 45.  Regarding relief for his fraudulent inducement claim, Melton states that he "was damaged when [Precision] terminated his employment with [Precision] less than eleven months after it started, a breach of the . . . employment term of no less than five years." <u>Id.</u> ¶ 46.

Precision argues that Melton's fraudulent inducement claim fails because a fraudulently induced contract is, at most, voidable under West Virginia law.  Def.'s Reply Supp. Mot. Dismiss 7-8.  When fraud is asserted as a contractual defense, "[a] contract fraudulently procured is not void, but only voidable, and the party complaining may elect to repudiate it or to be bound by it." <u>Coffman v. Viquesney</u>, 84 S.E. 1069, 1071 (W. Va. 1915).  Precision is correct that Melton's request for relief is inconsistent with the contract law concept of fraudulent inducement.

The court observes, however, that the alleged fraud in this case is more naturally construed as a tort claim rather than a fraudulent inducement contract law defense. <u>See</u> <u>Herrod v. First Republic Mortg. Corp., Inc.</u>, 218 W.Va. 611, 625, 625

21

S.E.2d 373, 387 (2005) (discussing "the difference between fraud as a contractual defense and fraud as a tort"). Despite Melton titling Count Three "Fraudulent Inducement," the induced Asset Purchase Agreement is only incidentally involved in the claim. Inducement is relevant only insofar as it supplies Precision's alleged motive for making a fraudulent misrepresentations as to the employment term. A tort construction is more consistent with the claim's affirmative nature and Melton's request for relief since "tort law imposes liability in damages for misrepresentation, while contract law does not." Id. (quoting Restatement (Second) Contracts ch. 7, intro. note (1981)). The court therefore construes Count Three not as an assertion of fraudulent inducement under a contract theory, but rather as an inarticulately pled fraud tort claim, which happens to relate to inducement.

Precision alternatively argues that Melton's fraudulent inducement claim is precluded by the Asset Purchase Agreement's integration clause. Def.'s Mot. Dismiss ¶ 14. The integration clause states that the Asset Purchase Agreement "constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior oral and written agreements between the parties with respect to the subject matter hereof." Asset Purchase Agreement 5.

22

Because fraud claims are a recognized exception to the liability limits arising from integration and merger clauses, see Traders Bank v. Dils, 226 W.Va. 691, 696, 704 S.E.2d 691, 696 (2010), Precision's argument is without merit.  Moreover, the Asset Purchase Agreement and its integration clause are only indirectly relevant to the alleged fraud since both the relief requested and misrepresentations claimed concern the employment contracts.

Finally, Precision argues that Pennsylvania's "gist of the action" doctrine bars Melton from pursuing tort claims that are in essence for the breach of contractual duties.  Def.'s Mot. Dismiss ¶ 12.  Pennsylvania's "gist of the action" doctrine, however, is inapplicable because West Virginia law governs Melton's tort claims.  West Virginia law does not preclude the fraudulent inducement claim.  The Supreme Court of Appeals has stated,

> Tort liability of the parties to a contract arises from the breach of some positive legal duty imposed by law because of the relationship of the parties, rather than from a mere omission to perform a contract obligation.  An action in tort will not arise for breach of contract unless the action in tort would arise independent of the existence of the contract.

Lockhart v. Airco Heating & Cooling, Inc., 211 W.Va. 609, 614, 567 S.E.2d 619, 624 (2002) (quoting 86 C.J.S. Torts § 4).  It is apparent that Melton's fraud claim arises independently of the

23

underlying contracts.  As discussed above, Precision's statements of intentions are not central to the agreement and do not constitute binding contractual promises.  They nonetheless can establish grounds for fraud.  See Croston v. Emax Oil Co., 195 W.Va. 86, 90, 464 S.E.2d 728, 734 (1995) (observing that fraud can be "based on statements . . . which constitute expressions of intention" if the "non-existence of the intention to fulfill the promise at the time it was made is shown").  The court concludes that the alleged misrepresentations are sufficiently distinct from the underlying contracts to support a fraud tort claim.[1]

## F. Negligence

Count Five alleges that Precision "negligently breached" its "duty to act reasonably in its dealings with Melton.  Compl. ¶¶ 53-54.  "As a direct, proximate, and foreseeable result" of that breach, Melton claims he suffered various financial injuries as well as emotional distress.  Id. ¶ 55.  Precision seeks to dismiss the negligence claim on the grounds that the Gist of the Action doctrine bars the claim as

---

[1] Melton's complaint vaguely suggests that Precision might have made other misrepresentations, oral or otherwise, that are external to the Addendum and CNC Agreement writings.  It states that Precision "made this representation [about the employment term] to Melton, and in fact the representation . . . was incorporated into the [agreements]."  Compl. ¶ 44.  Any such evidence would further support the court's conclusion that fraud exists independently of the contract.

duplicative of breach of contract and, in addition, that Melton has not properly pled a duty that Precision owed to him.  Def.'s Mem. Supp. Mot. Dismiss 9-11.  Because the court agrees that Melton's negligence claim fails in its entirety, the court does not address Precision's third argument: that Melton failed to plead a cognizable claim for emotional distress.  Id. at 11

To establish a prima facie case of negligence, a plaintiff must show that the defendant "has been guilty of some act or omission in violation of a duty owed to the plaintiff." Conley v. Stollings, 223 W.Va. 762, 766, 679 S.E.2d 594, 598 (2009) (quoting Syl. Pt. 1, Parsley v. General Motors Acceptance Corp., 167 W.Va. 866, 866, 280 S.E.2d 703, 704 (1981)).  There can be no negligence action without a duty broken.  Id.  Where the duty is one based solely upon contract, however, the plaintiff's remedy is for breach of contract rather than negligence.  Cavcon, Inc., 557 F. Supp. 2d at 723-24.  "To the extent plaintiff's negligence claim is based on a duty set forth in the agreement, it fails."  Id. at 724.

Unlike the fraudulent inducement claim, Melton's negligence claim does not exist independently of the contract and is not a valid cause of action.  Melton fails to establish that Precision's "duty to act reasonably in its dealings" is in any way distinct from its contractual duties.  See Stand Energy

25

_Corp. v. Columbia Gas Transmission Corp._, 373 F. Supp. 2d 631, 644 (S.D. W. Va. 2005) (agreeing with the defendant's position "that West Virginia law does not recognize an independent cause of action for a breach of duty of good faith and fair dealing separate and apart from a breach of contract claim").  Apart from the contractual duties, it is unclear what duty Precision owed Melton and could have breached.  See _Fifth Third Bank v. McClure Properties, Inc._, 724 F. Supp. 2d 598 (S.D. W. Va. 2010) (concluding that a negligence claim based on the defendant having "breached its duty to fund the loan in a reasonable manner" is really a contract claim); _Steel of West Virginia, Inc. v. AMI G.E., LLC_, 2009 WL 1648915 (S.D. W. Va. June 10, 2009) ("Despite Plaintiff's contention its negligence claims arise separate and apart from the contract, they clearly do not. But for the contract, Defendant would have no duty to provide engineering services to Plaintiff and Defendant would owe no duty of care to Plaintiff.").  Because Precision's only duties to Melton are contractual, Melton's negligence claim is not tenable.

## IV.

Based upon the foregoing discussion, it is, accordingly, ORDERED as follows:

1.  Precision's motion to dismiss be, and it hereby is, denied as to Counts One and Three;

2.    Precision's motion to dismiss be, and it hereby is, granted as to Counts Two and Five; and

3.    Precision's motion to dismiss Court Four to the extent it seeks, under the Wage Payment and Collection Act, post-termination commissions is granted.

The Clerk is directed to forward copies of this

written opinion and order to all counsel of record.

ENTER:    January 18, 2013

John T. Copenhaver, Jr.
United States District Judge

27